TIMOTHY ELDER (CA BAR NO. 277152)
ANNA R. LEVINE (CA BAR NO. 227881)
**TRE Legal Practice**
1155 Market Street, 10th Floor
San Francisco, CA 94103
Telephone:      (415) 873-9199
Facsimile:      (415) 952-9898
Email:           telder@trelegal.com
                  alevine@trelegal.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONIT MAZZONI,<br><br>                              Plaintiff,<br><br>        v.<br><br>MYRIAD GENETICS, INC.,<br><br>                              Defendant. | Case No. 5:19-cv-3884<br><br>**COMPLAINT FOR DISABILITY-BASED DISCRIMINATION IN VIOLATION OF 42 U.S.C. §§ 12112 AND 12113, 29 U.S.C. § 794, CAL. GOV'T CODE § 12940, CAL. BUSINESS & PROF. CODE §§ 17200 *ET SEQ.*, AND CALIFORNIA PUBLIC POLICY**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Plaintiff Ronit Mazzoni, through her attorneys, brings this lawsuit against Defendant Myriad Genetics, Inc. ("Myriad"), for violations of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–12117; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and California public policy for failing to hire her because of her disability even though she is clearly qualified to perform the essential duties of the job she seeks with a reasonable accommodation.

2.      Plaintiff is highly qualified by education, training, and nine years of work experience as a genetic counselor. She is blind and has successfully used screen reader software and accessible electronic information technology to obtain her education and maintain her current position as a genetic counselor at a hospital in Silicon Valley.

3.      Defendant employs genetic counselors that work remotely from their homes and other nearby locations in order to provide genetic counseling tele-healthcare services to patients across the United States. Plaintiff applied for several open remote genetic counselor positions with Defendant. After advancing her through several rounds of the interview process, Defendant ultimately told Plaintiff that it wanted to hire her based on her qualifications, but that it would not do so because of her need for screen reading software and accessible electronic Information technology. Defendant's employees, including genetic counselors, use an online Customer Relationship Management ("CRM") software system internally designed and developed by Defendant's technical staff. That CRM system currently has some digital accessibility barriers, which means that software code must be added to some parts of the system so that the information they present can be accessed through screen reading technology to accommodate blind employees. Through the interactive process, Defendant became aware that it would need to remediate those barriers, and that it had several available means to do so. Since Defendant controls the CRM system source code, it could remediate the barriers by modifying the relevant portions of that code. Alternately, Defendant could remediate the barriers through "scripting"—a

— 2 —

process by which screen reading software is programmed to interact with otherwise inaccessible software. However, Defendant refused to remediate the CRM system at all, and instead refused to hire Plaintiff.

4.      While Defendant may make pre-employment inquiries and requests for description or demonstration of an applicant's ability to perform job-related functions with a reasonable accommodation, it may only refuse to provide such reasonable accommodations if doing so would impose an undue hardship. Defendant inquired about Plaintiff's ability to perform job-related functions, and Plaintiff demonstrated that she could perform them with the reasonable accommodation of screen reading software. Plaintiff further demonstrated, through personally hiring an access technology expert at her own expense, that use of screen reading software was feasible with Defendant's systems. After these demonstrations, Defendant unilaterally ended the interactive process and unlawfully refused to hire Plaintiff without any analysis of the cost to provide the proposed accommodations.

5.      In addition, by developing and deploying workplace software that it requires employees to use, and that is inaccessible, Defendant has applied a qualification standard, employment test, or selection criteria that screens out or tends to screen out blind employees, and has utilized standards, criteria, or methods of administration that have the effect of discrimination based on an applicant's blindness. While CRM software may be job-related, the inaccessibility of such software certainly is not job-related, nor can it be consistent with business necessity.

6.      But for her blindness, Defendant would have hired Plaintiff in August 2017. Instead, Defendant required Plaintiff to hire an expert at her own expense to demonstrate the feasibility of the accommodations, proceeded to ignore those feasible accommodations, and refused to hire her in December 2017. That prohibited disparate treatment of Plaintiff was solely because she is blind.

**PARTIES**

7.      Plaintiff Ronit Mazzoni is a resident of San Jose, California. Plaintiff is blind and, therefore, is an individual with a disability within the meaning of Title I of the ADA, as defined by 42 U.S.C. § 12102; Section 504, as defined by 29 U.S.C. § 705(20); and the FEHA, as defined

— 3 —

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

by Cal. Gov't Code § 12926. Because Plaintiff is able to perform the job she seeks with a reasonable accommodation, she is a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12111(8); Section 504, 29 U.S.C. § 794(a); and the FEHA, Cal. Gov't Code § 12940.

8.      Defendant Myriad Genetics, Inc. is a publicly traded Delaware Corporation with headquarters at 320 Wakara Way, Salt Lake City, Utah, 84108, and offices at 180 Kimball Way, South San Francisco, California, 94080. Myriad has more than 2400 employees and, as such, is an employer covered by 42 U.S.C. § 12111(5)(A). Myriad is also an "employer" and a "person" as defined in Cal. Gov't Code §§ 12925 and 12926.

9.      Defendant is a recipient of federal financial assistance because it was founded upon federally funded intellectual property rights transferred under the Bayh-Dole Act, 35 U.S.C. §§ 200 *et seq.* Defendant also has current contracts with federal agencies to provide services. On information and belief, those contracted-for services include genetic counseling services.

10.      Defendant is primarily engaged in the business of providing health care.

JURISDICTION AND VENUE

11.      This is an action for declaratory, injunctive, compensatory, and punitive relief pursuant to Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–12117; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and California public policy.

12.      Ms. Mazzoni has exhausted all required administrative processes with the U.S. Equal Employment Opportunity Commission ("EEOC") and the California Department of Fair Employment and Housing ("DFEH"), which issued her Right-to-Sue letters on June 20, 2019, and May 1, 2019, respectively.

13.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

14.      This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state law claims all share common operative facts with her federal law

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

1   claims, and the parties are identical. Resolving all state and federal claims in a single action

2   serves the interests of judicial economy, convenience, and fairness to the parties.

3   15.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)

4   because a substantial part of Defendant's actions giving rise to Plaintiff's claims occurred in this

5   District and because Defendant is subject to personal jurisdiction in this District, and pursuant to

6   42 U.S.C. § 2000e-5(f)(3) because Plaintiff would have worked in this District but for the

7   unlawful employment practices complained of herein.

8                                          **FACTS**

9   16.     Plaintiff has a Master of Science in Genetic Counseling. She has nine years of experience

10  as a genetic counselor and is currently so employed at a public teaching and research hospital in

11  San Jose, California.

12  17.     In May 2017, Plaintiff applied for an advertised TeleGenetics counselor position with

13  Defendant.

14  18.     TeleGenetics Counselors are members of Defendant's Medical Services team who

15  provide remote genetic counseling services for customers through electronic and telephonic

16  communication, either from their homes or other nearby locations.

17  19.     Defendant's posted position was extremely valuable to Plaintiff because the benefit of

18  working from home would enable her more time and flexibility to parent her young children and

19  balance her personal and professional activities.

20  20.     On June 1, 2017, in response to Plaintiff's application, Michelle Landon, Defendant's

21  Manager of Medical Services, informed Plaintiff that, due to timing constraints, Defendant had

22  fulfilled its initial English-speaking TeleGenetics staffing needs with internal candidates.

23  21.     However, Ms. Landon went on to say that Defendant would have several additional

24  TeleGenetics positions becoming available in the next three to six months, and that she would

25  like to consider Plaintiff for one of those positions.

26  22.     Ms. Landon added that she had received several unsolicited recommendations of

27  Plaintiff's work by Defendant employees who had interacted with Plaintiff.

28  23.     Noting that such recommendations spoke very highly of Plaintiff, Ms. Landon reiterated

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

her sincere desire to speak with Plaintiff about a future TeleGenetics position.

24.     In late June or early July 2017, Ms. Landon informed Plaintiff that Defendant would like to interview her for an available TeleGenetics position.

25.     On July 20, 2017, Kaylee Henson and Allison Anguiano—members of Defendant's Medical Services team—conducted a first-round remote video interview of Plaintiff.

26.     Shortly thereafter, Defendant scheduled Plaintiff for a second-round in-person interview at Defendant's headquarters in Salt Lake City.

27.     On August 8, 2017, to assure Defendant prior to her arrival that she would be happy to answer any questions her interviewers might have about managing her work as a blind person, Plaintiff wrote to Ms. Landon to disclose her blindness.

28.     On August 11, 2017, Plaintiff met with Defendant management and team members throughout the day for a second-round interview.

29.     At the end of the day, she was told that Defendant would decide regarding her employment in one to two weeks.

30.     Instead, on August 22, 2017, Plaintiff received a request from Ms. Landon to participate in a videoconference with members of Defendant's informatics team to discuss accommodations to data systems.

31.     Plaintiff readily agreed to this request.

32.     However, in subsequent emails, it became clear that the purpose of the videoconference was not to discuss specific workplace accommodations, but to establish how Plaintiff was able to use a computer at all.

33.     On August 25, 2017, Plaintiff participated in a videoconference with Ms. Landon and members of Defendant's information technology team.

34.     Initially, during that videoconference, Plaintiff was asked to demonstrate how she was able to use her computer, including how to do a non-job-related web search.

35.     During that videoconference, Defendant's employees demonstrated and admitted their ignorance of access technology.

36.     After satisfying her inquisitors as to her ability to generally use a computer, Plaintiff

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

demonstrated how she was able to generate an electronic pedigree document—an essential function for a genetic counselor—using her access technology.

37.     One of Defendant's technology team members, who is not himself a genetic counselor, suggested that Plaintiff's pedigree document might not be sufficient because it was not drawn using a mouse-pointer-driven visual interface, even though it was correct in its content and presentation.

38.     Plaintiff assured Defendant's team that she would arrange to ensure that the pedigree documents she produced would meet any of Defendant's formatting requirements through software programming.

39.     Defendant's team also asked repeatedly about labeling graphics, despite Plaintiff's assurances that she was often able to learn to use software with minimal or no such labeling.

40.     Plaintiff expressed her willingness to be flexible about her work methods.

41.     Ms. Landon indicated that Defendant was not so flexible.

42.     Later, on August 28, 2017, Ms. Landon asked Plaintiff technical questions with respect to using screen reading technology with thin-client applications running on remote servers.

43.     Even though that sort of technical knowledge is far outside the duties of a genetic counselor, Plaintiff provided Ms. Landon with multiple high-level solutions involving use of Job Access with Speech ("JAWS"), a screen reading application that enables blind users to access Windows application software, including the types of specialized workplace software used by Defendant's genetic counselors.

44.     JAWS converts digital information on Windows computers into mechanized speech or to braille that can be read on a refreshable Braille display so that a blind user can perform the same computing functions as a sighted user with the same degree of ease.

45.     Plaintiff uses JAWS on a daily basis in her personal life and to work as a genetic counselor.

46.     Ms. Landon said she would get back to Plaintiff after reviewing Plaintiff's proposed JAWS solutions with the technology staff.

47.     On September 6, 2017, in response to an inquiry by Plaintiff, Ms. Landon said that

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

Defendant was "still working through the hiring process," but that Plaintiff would receive a hiring decision from her shortly.

48. Instead, Ms. Landon called Plaintiff on September 12, 2017, asking her to assist Defendant in testing its applications with JAWS.

49. Plaintiff suggested Defendant hire an accessibility consultant, but Ms. Landon refused.

50. Plaintiff agreed to assist Defendant. However, the only "assistance" Defendant wanted was access to Plaintiff's JAWS credentials, which Plaintiff provided to Stephen Loder from Defendant's IT department for testing purposes.

51. Rather than use an accessibility expert, or even an experienced JAWS user like Plaintiff, Defendant began testing its software applications with JAWS using its own staff on September 14, 2017.

52. None of Defendant's staff had experience or expertise in using or configuring screen reading software, nor in scripting software applications for use with JAWS.

53. Nevertheless, Defendant's staff did not attempt to contact an expert, nor did they attempt to contact Plaintiff.

54. On September 28, 2017, Ms. Landon called Plaintiff to inform her that Defendant's testing indicated that the CRM software was inaccessible.

55. Ms. Landon further informed Plaintiff that Defendant would not hire her without first confirming that there would be no technology problems that might affect Plaintiff's work, and that Defendant would not modify its CRM software to accommodate Plaintiff.

56. Plaintiff again suggested Defendant hire an accessibility expert to evaluate the CRM software to determine whether scripting or another solution could remediate it.

57. Ms. Landon said Defendant would consider that.

58. Subsequently, on October 5, 2017, Defendant agreed to engage Karl Smith, an access technology consultant, to evaluate the CRM software.

59. On October 13, 2017, Mr. Smith spent approximately ninety minutes testing the CRM software with JAWS.

60. In that limited time, he was able to confirm that it was an inaccessible Java application.

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

61.    However, he was not able to determine whether or to what extent it could be remediated because of his limited experience with Java software.

62.    On October 16, 2017, Ms. Landon informed Plaintiff that, since Mr. Smith was unable to remediate the CRM software, Defendant would not hire her.

63.    Ms. Landon admitted that she thought Plaintiff would make a good member of the team and would be good at the job she sought.

64.    However, Ms. Landon said that Defendant would not remediate the inaccessible CRM it developed.

65.    The next day, Plaintiff asked Ms. Landon to permit a different access technology consultant—one who was more experienced remediating Java software—to evaluate the CRM software.

66.    To convince Ms. Landon to accept, Plaintiff offered to pay for the evaluation, and Ms. Landon agreed.

67.    Plaintiff then engaged Virtual Vision Technologies ("VVT"), a firm with more than twenty-five years' experience in access technology consulting, to evaluate Defendant's CRM software and provide an initial assessment of whether and how that software could be remediated for use with JAWS.

68.    On November 10, 2017, VVT spent several hours testing the CRM software.

69.    VVT was able to determine that, with the correct configuration of software with JAWS, the CRM was largely accessible with JAWS.

70.    However, VVT noted that some software features would still require remediation if those features would need to be used with JAWS for the duties of the position Plaintiff sought.

71.    On November 14, 2017, VVT's Lead Integrator, Dan Buchness, wrote to Plaintiff and Defendant to deliver VVT's findings.

72.    Mr. Buchness explained that those aspects of the CRM software that are inaccessible could be remediated by Defendant's internal development team.

73.    He also explained that, if Defendant preferred, those aspects could instead be remediated through JAWS scripting by VVT or another experienced consultant.

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

74.    Mr. Buchness indicated that further testing was necessary to determine the full extent of remediation necessary to accommodate Plaintiff to ensure that she could perform all the essential duties of the position she sought.

75.    Finally, Mr. Buchness stated that, since Defendant was able to control development, it could choose to employ both development and scripting in combination for the most efficient short and long-term benefits.

76.    Plaintiff was thrilled to learn that the CRM could be remediated without much difficulty. She immediately wrote to Ms. Landon to express her thanks for allowing VVT to test the CRM, as well as her hope that they might continue discussion of her eventual employment.

77.    Ms. Landon wrote back to Plaintiff the following week to let her know that Defendant staff were discussing VVT's findings and proposed solutions, and that she would get back to Plaintiff shortly.

78.    Instead, when more than three weeks had elapsed since that last communication, Plaintiff wrote to Ms. Landon on December 15, 2017 to ask if there was any update with respect to Defendant's technical discussion of how to best implement a solution to accommodate her.

79.    Plaintiff received a phone call from Ms. Landon in response, during which Ms. Landon stated that Defendant would not continue investigating the extent of remediations necessary to make its software accessible, despite VVT's findings, and that it would instead not hire her.

80.    Ms. Landon stated that even though the CRM was under constant development, with updates being rolled-out every month, Defendant was unwilling to have its development team make changes to its programming methods to remediate the current CRM software or future updates thereto.

81.    Ms. Landon again told Plaintiff that she would love to hire her, and that Plaintiff would be great at the job she sought, but that Defendant was unwilling to change its policies, procedures, and methods of administration to accommodate her.

82.    To date, Plaintiff has spent one thousand, one hundred and seventy dollars out of her own pocket for VVT's evaluation of Defendant's CRM software.

83.    In 2017, Defendant reported total revenue of more than two-hundred million dollars, with

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

1   total profits of more than seventeen million dollars.

2   84.    Plaintiff remains interested in obtaining a position with Defendant that would enable her

3   to work from home.

4   **FIRST CLAIM FOR RELIEF**

5   **Disability-Based Discrimination in Violation of the Americans with Disabilities Act of 1990,**

6   **42 U.S.C. §§ 12112 and 12113**

7   85.    Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the

8   complaint.

9   86.    Plaintiff is a "qualified individual with a disability" as that term is defined by the ADA,

10  42 U.S.C. § 12111(8). She is able to perform the essential functions of her current position with or

11  without reasonable accommodations and is able to perform the essential functions of the position

12  she seeks with or without reasonable accommodations.

13  87.    The ADA prohibits an employer from discriminating "against a qualified individual with

14  a disability because of the disability of such individual in regard to … the hiring, advancement,

15  or discharge of employees." 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4(a)(ii).

16  88.    The ADA prohibits an employer from "limiting, segregating, or classifying a job

17  applicant or employee in a way that adversely affects the opportunities or status of such applicant

18  or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112(b)(1); 29

19  C.F.R. § 1630.5

20  89.    The ADA prohibits an employer from "utilizing standards, criteria, or methods of

21  administration … that have the effect of discrimination on the basis of disability." 42 U.S.C. §

22  12112(b)(3)(A); 29 C.F.R. § 1630.7(a).

23  90.    The ADA prohibits an employer from refusing to "mak[e] reasonable accommodations to

24  the known physical or mental limitations of an otherwise qualified individual with a disability

25  who is an applicant or employee, unless such covered entity can demonstrate that the

26  accommodation would impose an undue hardship on the operation of the business of such

27  covered entity" 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. §§ 1630.9(a), 1630.15(d).

28  91.    The ADA prohibits an employer from "denying employment opportunities to a job

— 11 —

applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(B); 29 C.F.R. § 1630.9(b).

92.     The ADA prohibits an employer from using "selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities" unless such criteria are shown to be job related and consistent with business necessity. 42 U.S.C. §§ 12112(b)(6), 12113(a); 29 C.F.R. §§ 1630.10(a), 1630.15(b)(1).

93.     In violation of the rights of Plaintiff to be free from disability-based discrimination, Defendant has and continues to develop, use, require use of, and refuse to modify inaccessible CRM software or other programs, and has subjected Plaintiff to disparate treatment by excluding her from employment based on her disability.

94.     In so doing, Defendant has subjected Plaintiff to disparate treatment by limiting and classifying her so as to adversely affect her employment opportunities because of her disability.

95.     In so doing, Defendant has refused to make reasonable accommodations to Plaintiff's known physical limitations.

96.     In so doing, Defendant has not demonstrated that making such an accommodation would impose an undue hardship on the operation of its business.

97.     In so doing, Defendant has excluded Plaintiff from employment opportunities based upon her need for reasonable accommodations.

98.     In so doing, Defendant has utilized standards, criteria, or methods of administration that require sight and have a disparate impact on Plaintiff and other persons with disabilities because they have the effect of denying employment to and otherwise discriminating against Plaintiff and other blind applicants on the basis of disability.

99.     In so doing, Defendant has not demonstrated that those standards, criteria, or methods of administration are job-related and consistent with business necessity, and that their performance cannot be accomplished with reasonable accommodation.

100.     In so doing, Defendant has used selection criteria that require applicants and employees

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

to access the functions of Defendant's CRM and other software using visual means, which has a disparate impact on Plaintiff and other persons with disabilities because they screen out or tend to screen out Plaintiff and other blind applicants and deny them employment opportunities.

101.    In so doing, Defendant has not demonstrated that those selection criteria are job-related and consistent with business necessity, and that their performance cannot be accomplished with reasonable accommodations.

102.    Defendant's unlawful actions and inactions were and are intentional and/or done with reckless disregard to the rights of Plaintiff to be free from discrimination based on disability.

103.    As a proximate result of the unlawful acts alleged herein, Plaintiff Mazzoni has suffered injuries, including emotional distress injuries and lost employment opportunities.

104.    As a result of the violations complained of herein, Plaintiff has and continues to suffer irreparable injury for which there is no plain adequate, or complete, remedy at law.

105.    Injunctive relief to end these violations is in the public interest.

106.    Plaintiff is entitled to, and Myriad is liable for, such injunctive relief. 42 U.S.C. §§ 12117(a) and 2000e-5(g)(1).

107.    Plaintiff is informed and believes, and thereon alleges, that Myriad denies the allegations complained of herein.

108.    An actual, present and justiciable controversy has arisen between Plaintiff and Myriad.

109.    Plaintiff seeks a declaration of her rights and other legal relations with respect to her controversy with Myriad.

110.    In addition to injunctive and declaratory relief, Plaintiff seeks and is entitled to compensatory, exemplary, and punitive damages; any lost benefits and compensation; and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### Disability-Based Discrimination in Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

111.    Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the complaint.

112.     Plaintiff is an individual with a disability as defined by 29 U.S.C. § 705(20).

113.     Section 504 mandates that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

114.     Defendant is a recipient of federal financial assistance subject to the requirements of Section 504. 29 U.S.C. § 794(b)(3)(A).

115.     Section 504 incorporates Title I of the ADA for the purposes of complaints alleging employment discrimination. 29 U.S.C. § 794(d).

116.     The violations complained of in paragraphs 93 through 101 above additionally constitute violations of Section 504.

117.     Defendant's unlawful actions and inactions were and are intentional and/or done with reckless disregard to the rights of Plaintiff to be free from discrimination based on disability.

118.     As a proximate result of the unlawful acts alleged herein, Plaintiff Mazzoni has suffered injuries, including emotional distress injuries and lost employment opportunities.

119.     Injunctive relief to end these violations is in the public interest.

120.     Plaintiff is entitled to, and Myriad is liable for, such injunctive relief. 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 2000e-5(g)(1).

121.     Plaintiff is informed and believes, and thereon alleges, that Myriad denies the allegations complained of herein.

122.     An actual, present and justiciable controversy has arisen between Plaintiff and Myriad.

123.     Plaintiff seeks a declaration of her rights and other legal relations with respect to her controversy with Myriad.

124.     In addition to injunctive and declaratory relief, Plaintiff seeks and is entitled to compensatory damages; any lost benefits and compensation; and attorneys' fees and costs.

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

### THIRD CLAIM FOR RELIEF

**Disability-Based Discrimination in Violation of the Fair Employment and Housing Act, Cal.**
**Gov't Code § 12940**

125.    Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the complaint.

126.    It is unlawful under the FEHA for an employer to refuse to hire or employ a person because of that person's physical disability. Cal. Gov't Code § 12940(a).

127.    It is unlawful under the FEHA for an employer to fail to make reasonable accommodation for the known physical disability of an applicant or employee. Cal. Gov't Code § 12940(m)(1); 2 CCR § 11068.

128.    It is unlawful under the FEHA for an employer to discriminate against a person for requesting such reasonable accommodation, regardless of whether the request was granted. Cal. Gov't Code § 12940(m)(2); 2 C.C.R. § 11072(a).

129.    It is unlawful under the FEHA for an employer, in response to a request for a reasonable accommodation from an applicant with a known disability, to fail to engage in a timely, good faith, interactive process with that applicant to determine effective reasonable accommodations, if any. Cal. Gov't Code § 12940(n); 2 C.C.R. § 11069.)

130.    It is unlawful under the FEHA for an employer to fail to take all reasonable steps necessary to prevent discrimination from occurring. Cal. Gov't Code § 12940(k).

131.    In failing to alter a policy, practice, qualification standard, or selection criteria that has a disparate impact on persons with disabilities, either because such policies or practices have an adverse impact on employment opportunities for persons with disabilities or because such qualification standards or selection criteria screen out or tend to screen out persons with disabilities, an employer must demonstrate that those policies, practices, qualification standards, or selection criteria are job-related and consistent with business necessity. 2 C.C.R. § 11017(a) and (e); 2 C.C.R. § 11072(b)(1).

132.    In violation of the rights of Plaintiff to be free from disability-based discrimination, Defendant has and continues to develop, use, require use of, and refuse to modify inaccessible

CRM software or other programs, and has subjected plaintiff to disparate treatment by refusing to hire her because she is blind.

133.    In so doing, Defendant has refused to make reasonable accommodations to Plaintiff's known physical disability.

134.    In so doing, Defendant refused to hire Plaintiff because she requested a reasonable accommodation.

135.    In so doing, Defendant subjected Plaintiff to disparate treatment by failing to engage in a good faith, interactive process with her to determine an effective reasonable accommodation.

136.    In so doing, Defendant failed to take all reasonable steps to prevent Plaintiff from suffering discrimination.

137.    In so doing, Defendant has not demonstrated that its policy and practice of developing or selecting inaccessible software for use by its employees is job-related and consistent with business necessity, and that altering that policy and practice is not a reasonable step to prevent discrimination against Plaintiff and other persons with disabilities from occurring.

138.    In so doing, Defendant has not demonstrated that its qualification standard or selection criteria that requires employees to access information in its CRM and other software through visual means is job-related and consistent with business necessity, and that altering that qualification standard or selection criteria is not a reasonable step to prevent discrimination against Plaintiff and other persons with disabilities from occurring.

139.    Defendant's unlawful actions and inactions were and are intentional and/or done with reckless disregard of the right of Plaintiff to be free from discrimination based on disability.

140.    As a proximate result of the unlawful acts alleged herein, Plaintiff has suffered injuries, including emotional distress injuries and lost employment opportunities.

141.    As a result of the violations complained of herein, Plaintiff has and continues to suffer irreparable injury for which there is no plain adequate, or complete, remedy at law.

142.    Injunctive relief to end these violations is in the public interest.

143.    Plaintiff is entitled to, and Myriad is liable for, such injunctive relief. Cal. Gov't Code § 12965(c).

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

144.    Plaintiff is informed and believes, and thereon alleges, that Myriad denies the allegations complained of herein.

145.    An actual, present and justiciable controversy has arisen between Plaintiff and Myriad.

146.    Plaintiff seeks a declaration of her rights and other legal relations with respect to her controversy with Myriad.

147.    In addition to injunctive and declaratory relief, Plaintiff seeks and is entitled to compensatory, exemplary, and punitive damages; any lost benefits and compensation; and attorneys' fees and costs.

<h3 style="text-align:center">FOURTH CLAIM FOR RELIEF</h3>

**Unfair Business Practices in Violation of California's Unlawful Competition Law, Cal.**

**Business & Prof. Code §§ 17200 *et seq.***

148.    Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the complaint.

149.    Unfair practices prohibited by California's Unfair Competition Law include "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

150.    By its past and continuing development, use, requirement of use, and refusal to modify inaccessible CRM software or other programs, and by refusing to engage in a good faith interactive process or otherwise address the access problems raised by Plaintiff when she requested a reasonable accommodation, Defendant has committed unlawful and unfair business practices, including but not limited to discriminating against Plaintiff on the basis of disability in violation of Title I of the ADA and discriminating against Plaintiff because of her physical disability in violation of the FEHA.

151.    As a proximate result of the unlawful and unfair business practices of Defendant, Plaintiff Mazzoni has suffered injury in fact and has lost money or property.

152.    As a result of the violations complained of herein, Plaintiff has and continues to suffer irreparable injury for which there is no plain adequate, or complete, remedy at law.

153.    Injunctive relief to end these violations is in the public interest.

154.    Plaintiff is entitled to, and Myriad is liable for, such injunctive relief. Cal. Bus. & Prof.

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

Code § 17203.

155.   Plaintiff is informed and believes, and thereon alleges, that Myriad denies the allegations complained of herein.

156.   An actual, present and justiciable controversy has arisen between Plaintiff and Myriad.

157.   Plaintiff seeks a declaration of her rights and other legal relations with respect to her controversy with Myriad.

158.   In addition to injunctive and declaratory relief, Plaintiff seeks and is entitled to restitution and attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF

### Violations of California Public Policy

159.   Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the complaint.

160.   California public policy bars employers from discriminating against employees based on disability, as demonstrated by the FEHA and UCL.

161.   By its actions and inactions complained of herein, Defendant has violated that public policy.

162.   As a proximate result of the unlawful acts alleged herein, Plaintiff Mazzoni has suffered injuries, including emotional distress injuries and lost employment opportunities.

163.   As a result of the violations complained of herein, Plaintiff has and continues to suffer irreparable injury for which there is no plain adequate, or complete, remedy at law.

164.   Injunctive relief to end these violations is in the public interest.

165.   Plaintiff is entitled to, and Myriad is liable for, such injunctive relief.

166.   Plaintiff is informed and believes, and thereon alleges, that Myriad denies the allegations complained of herein.

167.   An actual, present and justiciable controversy has arisen between Plaintiff and Myriad.

168.   Plaintiff seeks a declaration of her rights and other legal relations with respect to her controversy with Myriad.

169.   In addition to injunctive and declaratory relief, Plaintiff seeks, and is entitled to,

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

1   compensatory, exemplary, and punitive damages; any lost benefits and compensation; and

2   attorneys' fees and costs.

3                                   **RELIEF REQUESTED**

4   WHEREFORE, Plaintiff respectfully requests that this Court:

5       A.  Issue a declaration of the rights and duties of the respective parties;

6       B.  Grant a permanent injunction enjoining Defendant, its officers, servants, employees,

7           attorneys, all persons in active concert or participation with it, and successors, from

8           engaging in any employment practice that discriminates on the basis of disability;

9       C.  Order Defendant to remediate or replace its CRM and other inaccessible software to

10          make them accessible to Plaintiff and other persons with disabilities;

11      D.  Order Defendant to institute and carry out policies, practices, and programs which

12          provide equal employment opportunities for qualified individuals with disabilities, and

13          which eradicate the effects of its past and present unlawful employment practices;

14      E.  Order Defendant to place Plaintiff in a TeleGenetics counselor position commensurate

15          with her experience;

16      F.  Grant such other injunctive relief as may be appropriate;

17      G.  Order Defendant to make restitution to Plaintiff by providing appropriate back pay,

18          including wages, salary, employment benefits, and other denied or lost compensation,

19          with prejudgment interest, in amounts to be determined at trial, and any additional

20          restitution necessary to eradicate the effects of its unlawful business practices, as

21          cumulatively permitted under Cal. Bus. & Prof. Code §§ 17203, 17205 and 17206.1(d);

22      H.  Order Defendant to make Plaintiff whole by providing appropriate back pay, including

23          wages, salary, employment benefits, and other denied or lost compensation, with

24          prejudgment interest, in amounts to be determined at trial, and other affirmative relief

25          necessary to eradicate the effects of Defendant's unlawful employment practices,

26          including but not limited to front pay, as permitted under 42 U.S.C. § 2000e-5(g)(1);

27      I.  Order Defendant to make Plaintiff whole by providing compensatory damages for past

28          and future pecuniary losses resulting from Defendant's unlawful employment practices,

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]

as permitted by Cal. Civ. Code §§ 3281–3283, with prejudgment interest as permitted by Cal. Civ. Code § 3288, in amounts to be determined at trial;

J.  Order Defendant to make Plaintiff whole by providing compensatory damages for past and future nonpecuniary losses resulting from Defendant's unlawful practices, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, as permitted by Cal. Civ. Code §§ 3281–3283, with prejudgment interest as permitted by Cal. Civ. Code § 3288, in amounts to be determined at trial;

K.  Order Defendant to pay Plaintiff exemplary and punitive damages, as permitted without limitation under Cal. Civ. Code § 3294(a), and as permitted with limitation under 42 U.S.C. § 1981A, with prejudgment interest as permitted by Cal. Civ. Code § 3288;

L.  Award Plaintiff her reasonable attorneys' fees, reasonable expert witness fees, and other costs of this action;

M.  Award Plaintiff post-judgment interest; and

N.  Grant such further relief as the Court deems necessary and proper.

**JURY DEMAND**

Plaintiff demands trial by jury of all claims and causes of action so triable.


DATED: July 5, 2019                                    Respectfully submitted,


                                                       TRE LEGAL PRACTICE


                                                       */s/Timothy Elder*
                                                       Timothy R. Elder
                                                       *Attorneys for Plaintiff*

COMPLAINT FOR DISABILITY-BASED DISCRIMINATION [5:19-CV-3884]